IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SB1 FEDERAL CREDIT UNION | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FINSECURE LLC, ET AL. | : | NO. 13-6399 |

**MEMORANDUM**

**Padova, J.**                                                                            **April 8, 2014**

Plaintiff Sb1 Federal Credit Union ("Sb1") commenced this action against Defendants FinSecure LLC and Berkley Regional Insurance Company after Defendants denied coverage for damages that Plaintiff sustained as a result of fraudulent wire transfers.   Defendants have filed a Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, we grant the Motion.

**I.      BACKGROUND**

The Complaint alleges that Sb1 is a registered credit union serving members in the United States and abroad.   (Compl. ¶¶ 1-2.)   Defendant Berkley Regional Insurance Company issued a Credit Union Bond (the "Policy") to Sb1.   (Id. ¶ 51.)   The Policy was effective from February 11, 2013 to February 11, 2016 (the "Policy Period"), and provided $1,000,000 in coverage for "Forgery or Alteration of an Instrument"; $5,000,000 in "Funds Transfer" coverage; $5,000,000 in "Faithful Performance" coverage; and $6,000,000 in "Employee or Director Dishonesty" coverage.   (Id. ¶¶ 51-52.)   Defendant FinSecure is the underwriter for the Policy, and the Policy requires FinSecure to pay for covered losses incurred by Sb1 during the Policy Period.   (Id. ¶¶ 8, 53.)

**A.   The Underlying Fraud**

In December 1988, an individual ("Member") applied for membership with Sb1.   (Id. ¶

11.)   In doing so, Member provided Sb1 with his address, telephone number, social security number, date of birth, and other identifying information.  (Id.)   Member also opened a checking account with Sb1 and provided a specimen of his signature.  (Id. ¶ 13.)   Member authorized Sb1 to recognize any of the signatures subscribed to the account in payment of funds or in the transaction of business for the account.  (Id. ¶ 14.)   Member also regularly managed his accounts with Sb1 electronically.  (Id. ¶ 15.)

On July 2, 2013, an Sb1 employee received an email from Member's email address, from an individual purporting to be Member.  (Id. ¶ 21.) The individual requested that Sb1 wire $70,000 from Member's checking account to another account in Thailand pursuant to instructions attached to the email.  (Id. ¶ 22.)   The Sb1 employee filled out a wire request form and emailed the form to the individual, instructing him to sign the form and send it back with a copy of his driver's license or passport.  (Id. ¶ 23.)   Shortly before the close of business that day, the individual purporting to be Member faxed the completed form back to Sb1, but also sent an e-mail stating that he did not have the ability to make and provide a copy of his driver's license or passport because he was travelling.  (Id. ¶ 24.)   The Sb1 employee was aware of Sb1's wire transfer policy (the "Wire Transfer Policy"), which requires telephone verification on a recorded line, in a call initiated by the credit union, for all wire transactions of credit union funds to a non-credit union account.[1]  (Id. ¶¶ 16-17, 25.)   However, the Sb1 employee did not perform the

---

[1] Specifically, the Wire Transfer Policy provides:

> Staff authorized to perform wire transfers will be those named in a
> listing maintained by the VP Finance.
>
> Transactions by wire of credit union funds to a non credit union
> account in any amount will require telephone verification on a

required callback procedure.   (Id. ¶ 25.)   Instead, based on her past experience with Member and relying on Sb1's signature verification procedure, the employee responded that the transfer request could be processed, noting that Sb1 had Member's signature on file and Member had authorized Sb1 in his membership agreement to recognize his signature in the transaction of any business for his account.   (Id. ¶ 26.)   The transfer request was processed that same day.   (Id. ¶ 27.)

On July 9, 2013, the Sb1 employee again received an email from Member's email, from an individual purporting to be Member.   (Id. ¶ 28.)   The individual stated that he expected a large deposit into his checking account that week and asked to be advised of the balances in his account. (Id. ¶ 29.)   In an email response, the Sb1 employee advised the individual of the current balances in Member's accounts.   (Id. ¶ 30.)   About an hour later, the employee received another email from Member's email account.   (Id. ¶ 31.)   In that email, the individual purporting to be Member stated that he had an ongoing business deal in Thailand that he needed to complete that week, and he asked that Sb1 wire him $128,000 from his savings account to a different bank in Thailand. (Id. ¶ 32.)   The employee again filled out a wire request form and sent it via email to the individual purporting to be Member for his signature.   (Id. ¶ 33.)   The individual returned the signed form and the employee processed the wire request, again without following Sb1's Wire Transfer Policy.   (Id. ¶¶ 34-35.)

On July 15, 2013, the Sb1 employee received a third email from Member's email, again

_____

recorded line, on a call initiated by the financial institution performing the wire, with a person other than the one who initiated the wire, prior to funds being wired.   CU staff will document such verification on a Wire Authorization form which will be stored in the daily work.

(Id. ¶ 17.)

from the individual purporting to be Member.   (Id. ¶ 36.)   The individual stated that he believed

the large deposit had not yet been deposited, but that he had been notified of the delay.   (Id. ¶ 37.)

He then asked that Sb1 wire $65,000 to an account in Singapore to help pay expenses related to a

house he owned in France.   (Id. ¶ 38.)   The Sb1 employee followed the same procedure that she

had followed on July 2 and July 9, and processed the wire transfer request that day.   (Id. ¶ 39.)

On July 16, 2013, Member called to speak with the Sb1 employee about the activity on his

account.   (Id. ¶ 40.)   Member stated that the wire transfers were fraudulent and put his statement

in writing.   (Id. ¶ 41.)   Sb1 filed a police report with the local police department, and that report

was forwarded to the Commercial Affairs Department in Singapore.   (Id. ¶¶ 42-43.)   Despite its

best efforts, Sb1 has been unable to recover the money.   (Id. ¶ 44.)

### B.    The Policy Provisions

The Policy, which is attached as Exhibit A to the Complaint, contains several, separately

defined "Insuring Agreements."   A "Funds Transfer" Insuring Agreement provides coverage for

> (O)(1)   Loss resulting directly from fraudulent instruction through
> E-mail, Telefacsimile or Telephonic means received by the Insured
> from a person who purports to be the Accountholder, the
> Accountholder's authorized representative or an Employee but is
> not the Accountholder, provided:
>
> > (a) the Insured performed a Callback Verification with
> > respect to such instruction, or
> >
> > (b) the Insured followed a commercially reasonable security
> > procedure set forth in a written funds transfer agreement,
> > signed by the Accountholder or the Accountholder's
> > authorized representative, that governs the transaction and
> > instruction.

(Id. ¶ 64.)

A "Forgery or Alteration" Insuring Agreement provides coverage for "loss resulting from

4

Forgery or alteration of an Instrument."   (Id. ¶ 60.)   The Policy defines "forgery" as "affixing the handwritten signature, or a reproduction of the handwritten signature, of another natural person without authorization or ratification, and with the intent to deceive."   (Id. ¶ 61.)

An "Employee or Director Dishonesty" Insuring Agreement provides coverage for:

> (A) Loss resulting directly from dishonest acts committed by an Employee or Director, acting alone or in collusion with others, with the intent to cause the Insured to sustain such loss, or obtain an improper financial benefit for the Employee, director or for any other person or entity.

(Id.  ¶ 68.)

A "Faithful Performance" Insuring Agreement provides coverage for "Loss resulting from a named Employee's Failure to Faithfully Perform His/Her Trust."   (Id. ¶ 65.)   The Policy defines "Failure to Faithfully Perform His/Her Trust" to mean "acting in conscious disregard of the Insured's established and enforced share, deposit or lending policies."   (Id. ¶ 66.)   It further clarifies that "Failure to Faithfully Perform His/Her Trust" does not mean:

> (1) negligence, mistakes or oversights; (2) acts or omissions resulting from inadequate training; (3) unintentional violation of laws or regulations; (4) unintentional violation of the Insured's policies or procedures; (5) acts or omissions known to, acquiesced in, or ratified by the Insured's Board of Directors; or (6) acts of an Employee for which the Insured could have made a claim under the Employee or Directly Dishonesty Insuring Agreement.

(Id. ¶ 67.)

The Policy also contains certain exclusions, including "Exclusion q," which excludes coverage for the following:

> (q) loss resulting directly or indirectly from a fraudulent instruction through E-mail, Telefacsimile, or Telephonic means, or ACH debit from the Accountholder's account that was originated through another financial institution, except as may be covered under the

Employee or Director Dishonesty Insuring Agreement or the Funds
Transfer Insuring Agreement.

(Policy at 22, ¶ (q).)

###### C.      Sb1's Claims under the Policy

On July 17, 2013, Sb1 notified FinSecure by telephone of the loss it had incurred as a result of the fraudulent transfers, and asked whether it should take any steps to mitigate its covered losses.   (Compl. ¶ 45.)   As a result of this informal call, Defendants issued a formal coverage denial letter dated July 18, 2013.   (Id. ¶ 46.)

The following week, Sb1 submitted a formal claim form to Defendants, in accordance with the claims procedures set forth in Section 5 of the Policy.   (Id. ¶ 47.)   Sb1 requested coverage under the Forgery or Alteration of an Instrument Insuring Agreement as well as the Funds Transfer Insuring Agreement.   (Id. ¶ 55.)   In the alternative, it requested coverage under the Faithful Performance Insuring Agreement, or the Employee or Director Dishonesty Insuring Agreement. (Id.)   Defendants again denied coverage.   (Id. ¶ 48.)   On or about July 27, 2013, Sb1 submitted a letter response to the denial, contesting Defendants' conclusion that no coverage was owed.   (Id. ¶ 49.)   In a letter dated September 30, 2013, Defendants confirmed receipt of Sb1's letter, but stated that their coverage decision remained the same.   (Id. ¶ 50.)

According to the Complaint, Defendants denied coverage under the Funds Transfer Insuring Agreement because the Sb1 employee did not follow Sb1's callback verification procedure as required by the Policy.   (Id. ¶ 70.)   Defendants denied coverage under the Employee or Director Dishonesty Insuring Agreement based on its assertion that the provision did not apply under the facts of this case.   (Id. ¶ 75.)   Defendants also claimed that "Exclusion q" barred coverage under the Forgery or Alteration of an Instrument and Faithful Performance

Insuring Agreements.   (Id. ¶ 72.)

SB1's Complaint contains two Counts.   Count I seeks a declaratory judgment that it is entitled to coverage under the Policy.   Count II asserts a breach of contract claim, contending that Defendants breached their contractual obligations under the Policy by refusing to pay Sb1 for its losses.   The Complaint alleges that Sb1 has suffered losses as a result of the coverage denial, including $263,000 that it credited to Member's account after the fraud, plus an account service charge; fees and costs associated with its attempts to mitigate its losses; and fees and costs incurred in seeking coverage under the Policy.   (Id. ¶ 59.)

## II.   LEGAL STANDARD

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), we look primarily at the facts alleged in the complaint and its attachments.   Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).   We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).   Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation."   Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."   Twombly, 550 U.S. at 555 (alteration in original) (quotation omitted).   The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim

7

to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557) (alteration in original)).  In the end, we will dismiss a complaint if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 1235-36 (3d ed. 2004)).

## III.    DISCUSSION

Defendants argue in their Motion to Dismiss that we should dismiss Sb1's claims because the Complaint does not allege facts that would trigger any coverage under the unambiguous Policy.  Sb1 counters that it has stated claims upon which relief may be granted under several different Policy provisions:  the Funds Transfer Insuring Agreement, the Employee or Director Dishonesty Insuring Agreement, the Forgery or Alteration of an Instrument Insuring Agreement, and the Faithful Performance Insuring Agreement.  For the following reasons, we conclude that Sb1 has failed to state cognizable claims under any of the Insuring Agreements.

### A.    Funds Transfer Insuring Agreement

As noted above, the Funds Transfer Insuring Agreement provides coverage for the losses at issue, which were caused by fraudulent instructions through email or facsimile, only if Sb1 either (1) performed a callback verification, or (2) "followed a commercially reasonable security procedure set forth in a written funds transfer agreement, signed by [Member] . . . , that governs the transaction and instruction."   (Compl. ¶ 64.)   Here, the Complaint concedes that the Sb1 employee did not perform a callback verification procedure.   (Id. ¶¶ 21-25, 32-35.) Consequently, the cognizability of Sb1's claim for coverage under the Funds Transfer Insuring Agreement is dependent upon whether the Complaint adequately alleges that Sb1 "followed a commercially reasonable security procedure set forth in a written funds transfer agreement, signed by the Accountholder . . . , that governs the transaction and instruction."   (Id. ¶ 64.)

Defendants argue that the Complaint fails to adequately allege Sb1's compliance with this aspect of the Funds Transfer Insuring Agreement's coverage requirements because (1) it does not specifically allege that Member signed a "written funds transfer agreement that governs the transaction[s] and instruction[s]," and (2) under the Pennsylvania Uniform Commercial Code ("Pennsylvania UCC"), the signature authorization procedure that the Sb1 employee utilized does not constitute "commercially reasonable security procedure."   See 13 Pa. Cons. Stat. Ann. § 4A202 (stating that "commercial reasonableness of a security procedure is a question of law"), and id. § 4A201 (providing that "comparison of a signature . . . is not by itself a security procedure").

As noted above, in order to state a facially plausible claim, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Ashcroft, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).   A

complaint is insufficient if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557 (alteration in original)).  Here, the Complaint is devoid of factual enhancement from which we can reasonably infer that Member signed a written agreement, much less that the written agreement set forth a security procedure for the particular transactions and instructions at issue.   Indeed, although the Complaint alleges that Member had "Membership and account agreements" with Sb1, it does not allege that these agreements (1) were written, (2) included a "funds transfer agreement" that addressed the transactions and instructions at issue, and/or (3) were signed by Member.  Moreover, while the Complaint alleges that the agreements "set forth commercially reasonable security procedures which included the ability to authorize an instruction by comparing the signature submitted with a specimen signature provided by the Member," it does not precisely describe the procedure authorized, such that we can reasonably infer that the procedure was commercially reasonable.[2] In sum, we conclude that the Complaint fails to contain enough factual specificity to permit us to reasonably infer that Sb1 "followed a commercially reasonable security procedure set forth in a written funds transfer agreement, signed by the Accountholder . . . , that governs the transaction and instruction," and to therefore draw a reasonable inference that Defendants are liable to Sb1 under the Funds Transfer Insuring Agreement.   We therefore grant Defendants' Motion insofar

---

[2] Defendants have asked us to hold, based on the Complaint's allegations and Pennsylvania statutory law, that the security procedures that were allegedly authorized and that the Sb1 employee utilized were not commercially reasonable.   However, we decline to do so at this time given that Sb1's claims fail on other bases, and given our uncertainty as to the precise security procedures that were allegedly authorized and utilized.   Moreover, Defendants' argument regarding the commercial reasonableness of the security procedures, which appears only in their reply brief, is not well developed and does not establish the legal basis for applying the Pennsylvania UCC's standard for commercial reasonableness to interpret the term "commercially reasonable" in the Policy.

as it seeks dismissal of that portion of Sb1's declaratory judgment and contract claims that rest on allegations of coverage under the Funds Transfer Insuring Agreement.[3]

### B.      The Employee or Director Dishonesty Insuring Agreement

The Employee or Director Dishonesty Insuring Agreement provides coverage when the credit union suffers a loss that "result[s] directly from dishonest acts committed by an Employee," who is acting "with the intent to cause the [credit union] to sustain [the] loss, or obtain an improper financial benefit for the Employee."  (Compl. ¶ 68.)  The Complaint asserts that Sb1 "seeks coverage under this provision to the extent that discovery shows that the employee's acts were taken with the intent to cause Sb1 to sustain a loss, or to obtain an improper financial benefit." (Compl. ¶ 75.)

Defendants argue in their Motion to Dismiss that Sb1 has failed to state a claim upon which relief may be granted for coverage under the Employee or Director Dishonesty Insuring Agreement, because the Complaint does not specifically allege that the employee who authorized the fraudulent wire transfers acted with the intent to cause harm to Sb1 or to obtain a financial benefit for herself or another person.   They emphasize that, to the contrary, the Complaint seems to be exclusively grounded on allegations that the employee made a mistake, exercised an error in judgment or was simply careless.   Specifically, they note that the Complaint alleges that the Sb1

---

[3] We note that Sb1 has not requested leave to amend the Complaint and, thus, we have no obligation to permit amendment.  See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 253 (3d Cir. 2007) ("[I]t is hardly error for a district court to enter final judgment after granting a Rule 12(b)(6) motion to dismiss when the plaintiff has not properly requested leave to amend its complaint.")   Of course, after final judgment is entered, Sb1 has a 28-day window in which it can seek to reopen the judgment and amend the complaint, if it believes that it can state a claim upon which relief may be granted by supplementing its allegations.  Fed. R. Civ. P. 59(e); Fletcher-Harlee, 482 F.3d at 253 (citing Fed. R. Civ. P. 59(e) (2007)).

Case 2:13-cv-06399-JP   Document 15   Filed 04/09/14   Page 12 of 16

employee approved the wire transfer "based on her past experience dealing with the member and upon information and belief pursuant to [Sb1's] signature verification procedure." (Compl. ¶¶ 25-26). Sb1 acknowledges that it has not explicitly pleaded that the Sb1 employee had the requisite intent for coverage under the Employer or Director Dishonesty Insuring Agreement, but it maintains that it need not do so, because it has not yet had the opportunity for discovery.[4]

We conclude, however, that Sb1's claim for coverage under the Employee or Director Dishonesty Insuring Agreement is not cognizable because the Complaint at no point alleges that the Sb1 employee had the requisite intent – namely, to harm Sb1 or to obtain a financial benefit for herself or someone else. We recognize that Federal Rule of Civil Procedure 11(b)(3) permits a party's attorney, who does not yet have evidentiary support for a factual contention, to allege that, to the best of his knowledge, reason, or belief, formed after a reasonable inquiry, certain "factual contentions . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Here, however, we do not read the Complaint to in any way suggest that counsel actually believes that there is a likelihood that discovery will reveal that the Sb1 employee intended either harm to Sb1 or to obtain a financial benefit for herself or for any other person. Moreover, it alleges no facts or circumstances from

---

[4] Sb1 also appears to argue that it need not allege the facts necessary to state a claim for coverage under the Employee and Director Dishonesty Insuring Agreement because it asserted that claim as an alternative to its claim under the Funds Transfer Insuring Agreement. The Federal Rules of Civil Procedure expressly permit a plaintiff to "set out 2 or more statements of a claim . . . alternatively or hypothetically," and to "state as many separate claims . . . as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2), (3) (emphasis added). The Rules also provide, however, that where a party pursues two alternate theories, at least one of the two must be sufficiently pleaded. See Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.") Here, we have dismissed Sb1's claim under the Funds Transfer Insuring Agreement for fatal pleading deficiencies. Accordingly, Sb1's alternative claim under the Employee and Director Dishonesty Insuring Agreement will only survive Defendants' 12(b)(6) Motion if it states a cognizable claim in its own right.

which we could reasonably infer that such intent actually exists.   Thus, the Complaint fails to allege an essential prerequisite to coverage under the Employee or Director Dishonesty Insuring Agreement, and we dismiss Sb1's contract and declaratory judgment claims insofar as they rest on alleged coverage pursuant to that Insuring Agreement

C.      **Forgery or Alteration of an Instrument and Faithful Performance Insuring Agreements**

SB1 also seeks to recover under the Forgery or Alteration of an Instrument and Faithful Performance Insuring Agreements.   Defendants counter that recovery under these provisions is barred by Exclusion q.   Pursuant to Exclusion q, there is no coverage for any "loss resulting directly or indirectly from a fraudulent instruction through E-mail, Telefacsimile, or Telephonic means, or ACH debit from the Accountholder's account that was originated through another financial institution, except as may be covered under the Employee or Director Dishonesty Insuring Agreement or the Funds Transfer Insuring Agreement."   (Policy at 22, ¶ (q).) Thus, Defendants argue that Sb1 may only seek coverage under the Funds Transfer and Employee or Director Dishonesty Insuring Agreements in this case and cannot state claims upon which relief may be granted under any other Insuring Agreements.

Sb1 argues in response that Exclusion q does not apply in this case because the fraudulent instructions by email and telefacsimile were not "originated through another financial institution." It disagrees with Defendants' assertion that the exclusion only requires ACH debits to be "originated through another financial institution," contending that this interpretation of the exclusion would "render the coverage afforded by the Faithful Performance Insuring Agreement illusory."   (Sb1 Br. at 12.)

As a general matter, an "insurance policy must be . . . construed according to the plain

13

meaning of its terms." C.H. Heist Caribe Corp. v. Am. Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981). Where the language is clear and unambiguous, we must give effect to the language. Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897 (Pa. 2006) Significantly, neither Sb1 nor Defendants argue that Exclusion q is ambiguous, but they nevertheless disagree as to the exclusion's plain meaning. See Neuhard v. Travelers Ins. Co., 831 A.2d 602, 605 (Pa. Super. Ct. 2003) ("[A]n ambiguity does not exist simply because the parties disagree on the proper construction to be given a particular policy provision." (citation omitted)). We similarly do not find the exclusion to be ambiguous, and instead find Sb1's reading to be unreasonable. Hutchison v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986) (explaining that language is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense" (emphasis added) (citation omitted)); see also St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981) (a court should not "torture the language" of a contract to create ambiguities).

Indeed, in spite of Sb1's argument, it is plain that the phrase "originated through another financial institution" pertains only to ACH debits, and not to instructions sent via "E-mail, Telefacsimile or Telephonic means." It is an established principle of contract interpretation that "'a limiting clause in a policy is to be confined to the last antecedent unless the context or evident meaning requires a different construction.'" Contrans, Inc. v. Ryder Truck Rental, Inc., 836 F.2d 163, 167 (3d Cir. 1987) (quoting 13 Appleman, Insurance Law and Practice, § 7387 at 181–82 (1976), and citing Black's Law Dictionary 794 (5th ed. 1979)). Here, the context in no way requires a different construction. In fact, to the contrary, the Funds Transfer Insuring Agreement itself separately addresses "[l]oss[es] resulting directly from fraudulent instructions through

E-mail, Telefacsimile or Telephonic means" (Policy at 4, ¶¶ (O)(1)-(2)), and "[l]oss[es] resulting directly from a fraudulent or unauthorized ACH debit from the Accountholder's account that was originated through a financial institution other than the Insured" (id. ¶ (O)(3)).   Moreover, the fact that the phrase "or ACH debit from the Accountholder's account that was originated through another financial institution" is set apart from the remaining text of the exclusion with commas provides further support for the conclusion that it is only ACH debits that must be "originated through another financial institution."   For all of these reasons, we reject Sb1's contention that Exclusion q only limits its ability to recover losses resulting from e-mails, faxes, and phone calls when those communications originate from a financial institution.

We also reject Sb1's contention that reading the exclusion as we do will render illusory the coverage afforded by the Faithful Performance Insuring Agreement.   According to Sb1, our interpretation would "exclude from coverage any act of an employee done in conscious disregard of Sb1's procedures if the act resulted in a fraudulent fund transfer."   (Sb1 Br. at 13.)   Even assuming _arguendo_ that this is correct, it does not follow from this premise that coverage under the Faithful Performance Insuring Agreement is therefore illusory.   Rather, the Faithful Performance Insuring Agreement continues to apply to situations in which employees act in conscious disregard of credit union policies not involving funds transfers.   See, e.g., Raritan Bay Federal Credit Union v. Cumis Ins. Society, Inc., Civ. A. No. 09-1512, 2010 WL 4292175, *2 (D.N.J. Oct. 21, 2010) (discussing applicability of faithful performance coverage in connection with an employee's approval of loans in conscious disregard of credit union loan approval policies).   Accordingly, we find that application of Exclusion q in this case does not render coverage under the Faithful Performance Insuring Agreement illusory.

15

Having concluded that Exclusion q unambiguously bars coverage for losses resulting from fraudulent instructions by e-mail or facsimile, except as provided in the Fund Transfer Insuring Agreement and the Employee and Director Dishonesty Insuring Agreement, we necessarily conclude that Sb1 fails to state claims upon which relief may be granted under the Forgery or Alteration of an Instrument and Faithful Performance Insuring Agreements. We therefore dismiss Sb1's breach of contract and declaratory judgment claims insofar as they rest on allegations of coverage under these two Insuring Agreements.

## IV.    CONCLUSION

For the foregoing reasons, we grant Defendants' Motion to Dismiss in its entirety. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.

16